1    .

2

3

4

5

6

7

8                      **UNITED STATES DISTRICT COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10

11   TINA MESHELL HAYES,                Case No. CV 15-4412 SS

12              Plaintiff,

13        v.
                                        **MEMORANDUM DECISION AND ORDER**
14   CAROLYN W. COLVIN, Acting
     Commissioner of the Social
15   Security Administration,

16              Defendant.

17

18

19

20                               **I.**

21                          **INTRODUCTION**

22

23       Plaintiff Tina Meshell Hayes ("Plaintiff") seeks review of

24   the final decision of the Commissioner of the Social Security

25   Administration (the "Commissioner" or the "Agency") denying her

26   application for Disability Insurance Benefits and Supplemental

27   Security Income.  The parties consented, pursuant to 28 U.S.C. §

28   636(c), to the jurisdiction of the undersigned United States

Magistrate Judge.   For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On June 11, 2012, Plaintiff filed applications for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI").  (Administrative Record ("AR") 10).   In both applications, Plaintiff alleged a disability onset date of October 24, 2010.   (Id.).   The Agency denied Plaintiff's applications on November 8, 2012.  (AR 67, 71).   On January 3, 2013, Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ").  (AR 76).   On July 25, 2013, Plaintiff appeared and testified at the hearing held before ALJ David J. Agatstein.  (AR 23).   Vocational expert Ms. Kristan V. Sagliocco and medical experts Glenn E. Griffin, PH.D., and Ronald Kendrick, M.D., also testified at the hearing.   (AR 10).   On September 9, 2013, the ALJ issued a decision denying benefits.  (AR 9).

Plaintiff requested review of the ALJ's decision, which the Appeals Officer denied on April 10, 2015.  (AR 1-4).   Plaintiff filed this action on June 10, 2015.  (Dkt. No. 1).

\\

\\

\\

\\

### III.

### FACTUAL BACKGROUND

Plaintiff was born on August 20, 1964 and was forty-eight (48) years old at the time of the 2013 hearing. (AR 31). Plaintiff was forty-six (46) years old at the time of her alleged disability onset date. (AR 43). Plaintiff testified that she dropped out of high school in tenth grade and later obtained a G.E.D. (AR 31, 148). Plaintiff speaks and understands English. (AR 25). Plaintiff previously worked as a customer service representative at a grocery store and as a security guard. (AR 148). Plaintiff alleges that she suffers from pain in her neck, back, left leg, and right wrist. (AR 33, 43, 56). Plaintiff also alleges that she suffers from depression, but that her depression does not interfere with her ability to work. (AR 33).

**A.   Medical Records**

From October 25, 2010 to July 11, 2013, Plaintiff underwent a series of physical and psychiatric evaluations. (AR 268, 327). Plaintiff was diagnosed with pain stemming from her neck, back, and right wrist. (AR 178-246, 296-300, 326-334).

1        **1.    Physical Evaluations And Treatments**

2

3        Specifically, between October 25, 2010 to February 29, 2012,

4   Plaintiff visited Advanced Care Specialists for the evaluation and

5   treatment of her back in connection with a worker's compensation

6   claim.  (AR 15, 251, 268).  On March 24, 2011, physician Dr. Randy

7   S. Higashi, D.C., examined Plaintiff.[1]  (AR 178).  On April 16,

8   2011, Dr. Amjad Safvi, M.D., conducted an MRI of Plaintiff's lumbar

9   spine and found mild degenerative disc disease.  (AR 205-06).

10

11        On April 26, 2011, physician Dr. Ronald M. Schilling, M.D.,

12  diagnosed Plaintiff with myofascial "low back pain[, which]

13  radiat[ed] to both legs with numbness and tingling to both feet."

14  (AR 245-46).   On November 8, 2011, Dr. Higashi prescribed

15  medications for Plaintiff, including "Vicodin, Naproxen,

16  Gabapentin and Prilosec[.]" (AR 191).  On January 10, 2012, Dr.

17  Edward Opoku, D.O., confirmed Dr. Higashi's diagnosis of

18  radiculopathy and continued Plaintiff's treatment.  (AR 191-92).

19  On February 29, 2012, Dr. Higashi treated Plaintiff with LSO-

20  Flexible[2] to support her back.  (AR 251).

21  _____

22  [1] According to John M. Caridi, M.D., Matthias Pumberger, M.D., and
    Alexander P. Hughes, M.D., cervical radiculopathy is "a syndrome
23  of pain and/or sensorimotor deficits due to compression of a
    cervical nerve root."  John M. Caridi, M.D., et al., Cervical
24  Radiculopathy:  A  Review,  NIH  (Sept.  9,  2011),
    http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3192889/.
25  [2] According to Jacek Cholewicki, PH.D., Angela S. Lee, B.Sc., N.
26  Peter Reeves, PH.D., and David C. Morrisette, PT, PH.D., an LSO or
    a Lumbar-sacral Orthosis is a "class I medical device[] that [is]
27  used in conservative and postoperative management of low back
    pain."  Jacek Cholewicki, PH.D., et al., Comparison of trunk
28  stiffness  provided  by  different  design  characteristics  of

4

From October 13, 2012 to July 11, 2013, Plaintiff visited Medpro Services, Inc., UC Family Medicine Center, and Beverly Tower Wilshire for the evaluation and treatment of her wrist and neck. (AR 296, 310-34).  Specifically, on October 13, 2012, Plaintiff went to Medpro Services, Inc., where Dr. Curtis Kephart, M.D., diagnosed Plaintiff with "mild wrist arthritis secondary to a non-displaced fracture[, and] cervical spondylosis with myofascial neck pain[.]"  (AR 296-300).  Dr. Kephart concluded that Plaintiff "could lift and carry 50 pounds occasionally and 25 pounds frequently[,] . . . push and pull frequently[,] . . . sit, walk and stand for six hours out of an eight-hour day[]" without an assistive device.  (AR 300).  Dr. Kephart also concluded that "[t]here were no manipulative or postural limitations[]" and that "the right hand can do fine and gross manipulations frequently[.]" (Id.).  Plaintiff "was treated with pain management, acupuncture and physical therapy."  (AR 190).

On January 10, 2013, Plaintiff went to the U.C. Family Medical Center where Dr. Uche Chukwudi, M.D., x-rayed Plaintiff's right wrist and found a fracture of the distal navicular bone.  (AR 311-12). In addition, Dr. Chukwudi found Plaintiff's cholesterol level to be out of range and poorly controlled.  (AR 316-17).  From March 22, 2013 to July 11, 2013, Plaintiff sought treatment at Beverly Tower Wilshire for her wrist and back.  (AR 326-34).  From March 22, 2013 to May 10, 2013,  Dr. Siamak Dardashti, M.D., took an MRI

---

lumbosacral       orthoses,       NIH       (Dec.       9,       2009), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2887766/.

5

1  of Plaintiff's back and found "broad based disc osteophyte[3],
2  moderate left lateral recess and foraminal narrowing." (AR 329-
3  31). On July 11, 2013, Dr. Tinoosh Zand, M.D., took an MRI of
4  Plaintiff's right wrist and found "a chronic non[-]union[4] fracture
5  of the distal pole of the scaphoid without evidence for
6  osteonecrosis.[5]" (AR 326-27). Dr. Zand also found "[p]robable
7  chronic injury to the radial collateral ligament with abnormal
8  signal at the radial styloid[.]" (Id.).

10     **2.   Psychiatric Evaluation**

12     On October 10, 2012, Plaintiff visited Medpro Services, Inc.,
13  where Dr. Nina Kapitanski, M.D., conducted a psychiatric evaluation
14  and diagnosed Plaintiff with "a depressive disorder secondary to
15  general medical condition." (AR 269-73). Dr. Kapitanski noted
16  that Plaintiff "was well kept, well nourished and in no apparent
17  distress." (AR 271). Plaintiff acknowledged to Dr. Kapitanski
18  that she had a prior use of "street drugs" but stopped such usage

----

[3] According to Atul Goel, osteophytes "are commonly referred to as bone spurs that form along the joint margin." Atul Goel, M.D., Is it necessary to resect osteophytes in degenerative spondylotic myelopathy, NIH (Jan.-June 2013) http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3872653/.

[4] According to Marsh D, a non-union is "the cessation of both the periosteal and endosteal healing responses without bridging." Marsh D, Concepts of fracture union, delayed union, and nonunion., NIH, (Oct. 1998), http://www.ncbi.nlm.nih.gov/pubmed/9917623.

[5] According to the National Institute of Arthritis and Musculoskeletal and Skin Diseases, an osteonecrosis "is a disease caused by reduced blood flow to bones in the joints." What is Osteonecrosis? Fast Facts: An Easy-to-Read Series of Publications for the Public, NIH, (Nov. 2014), http://www.niams.nih.gov/health_info/osteonecrosis/osteonecrosis_ff.asp.

in 1999.  (AR 270).   Dr. Kapitanski also found that Plaintiff had "no difficulty maintaining composure and even temperament."  (Id.). Dr. Kapitanski then noted that Plaintiff "exhibited no evidence of auditory or visual hallucinations, delusions, or illusions[]" and that Plaintiff "denied current suicidal or homicidal ideations, plan, or intent."  (AR 269). Dr. Kapitanski reported that Plaintiff worked as a security guard for six years.  (AR 270).

In addition, Dr. Kapitanski "opined that [Plaintiff] had no past psychiatric history."  (AR 272).  Dr. Kapitanski also noted that "if [Plaintiff] received [psychiatric] treatment, her symptoms would significantly improve[.]"  (Id.).  Dr. Kapitanski continued that Plaintiff "had no difficulties in maintaining social functioning[]" and had "mild difficulties focusing and maintaining attention[] . . . concentration, persistence, and pace."  (Id.). According to Dr. Kapitanski, Plaintiff "would have no difficulties performing work activities on a consistent basis without special or additional supervision[]" and "no limitations accepting instructions from supervisors and interacting with coworkers and with the public."  (Id.).  Furthermore, Dr. Kapitanski found that Plaintiff "was intellectually and psychologically capable of performing activities of daily living[]."  (Id.).  Dr. Kapitanski concluded that Plaintiff "would have no limitations performing simple and repetitive tasks and mild limitations performing detailed and complex tasks."  (Id.).  Dr. Kapitanski also concluded that Plaintiff "would have mild difficulties handling the usual stresses, changes and demands of gainful employment."  (Id.).

**B.**   **Plaintiff's Testimony**

On July 25, 2013, Plaintiff testified about her background, including her education level, work history, and medical history. (AR 31-34). Plaintiff stated that she "dropped out [of high school] in 10th grade and [] went back to school in 2000 and got [her] high school diploma." (AR 31). Plaintiff stated that she was currently unemployed and that in the fifteen years before the date of her testimony, she was employed as a security guard and a grocery store employee. (AR 31-32). Plaintiff also testified that her previous employment ended because of "a fall down[,]" which precipitated pain in her neck and eventually in her back and right wrist. (AR 32-33).

Furthermore, Plaintiff stated that she did not have a mental impairment that would interfere with her ability to work. (AR 33). Plaintiff concluded by explaining that her right wrist became problematic after "couple of fall downs" notwithstanding an untreated non-union fracture that occurred twenty years ago. (AR 33-34).

## IV.

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity and that is expected to result in death or to last for a continuous

period of at least twelve months. <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe? If not, the claimant is found not disabled. If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of the specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1? If so, the claimant is found disabled. If not, proceed to step four.

(4)   Is the claimant capable of performing his past work? If so, the claimant is found not disabled. If not, proceed to step five.

1    (5) Is the claimant able to do any other work?  If not,

2      the claimant is found disabled.  If so, the claimant

3      is found not disabled.

4

5 Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari,

6 262 F.3d 949, 953-54 (9th Cir. 2001) (citations omitted); 20 C.F.R.

7 §§ 404.1520(b)-(g)(1) & 416.920(b)-(g)(1).

8

9   In between steps three and four, the ALJ must determine the

10 claimant's residual functional capacity ("RFC").   (20 CFR

11 416.920(e)).   To determine the claimant's RFC, the ALJ must

12 consider all of the claimant's impairments, including impairments

13 that are not severe.  20 CFR § 416.1545(a)(2).

14

15   The claimant has the burden of proof at steps one through

16 four, and the Commissioner has the burden of proof at step five.

17 Bustamante, 262 F.3d at 953-54.  "Additionally, the ALJ has an

18 affirmative duty to assist the claimant in developing the record

19 at every step of the inquiry."  Id. at 954.  If, at step four, the

20 claimant meets her burden of establishing an inability to perform

21 past work, the Commissioner must show that the claimant can perform

22 some other work that exists in "significant numbers" in the

23 national economy, taking into account the claimant's RFC, age,

24 education, and work experience.  Tackett, 180 F.3d at 1098, 1100;

25 Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1),

26 416.920(g)(1).  The Commissioner may do so by the testimony of a

27 vocational expert or by reference to the Medical-Vocational

28 Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2

1  (commonly known as "the Grids"). <u>Osenbrock v. Apfel</u>, 240 F.3d

2  1157, 1162 (9th Cir. 2001).  When a claimant has both exertional

3  (strength-related) and non-exertional limitations, the Grids are

4  inapplicable and the ALJ must take the testimony of a vocational

5  expert. <u>Moore v. Apfel</u>, 216 F.3d 864, 869 (9th Cir. 2000) (citing

6  <u>Burkhart v. Bowen</u>, 856 F.2d 1335, 1340 (9th Cir. 1988)).

7

8                                **V.**

9                        **THE ALJ'S DECISION**

10

11      The ALJ employed the five-step sequential evaluation process

12  and concluded that Plaintiff "has not been under a disability, as

13  defined in the Social Security Act, from October 24, 2010, through

14  the date of this decision[.]" (AR 19).  At step one, the ALJ found

15  that Plaintiff "[had] not engaged in substantial gainful activity

16  since October 24, 2010, the alleged onset date[.]"  (AR 12).

17

18      At step two, the ALJ found that Plaintiff "[had] severe

19  impairments including degenerative disc disease and osteoarthritis

20  in the cervical and lumbar spine, osteoarthritis of the right wrist

21  and a depressive disorder secondary to her general medical

22  condition[.]"  (<u>Id.</u>).  The ALJ found, however, that Plaintiff's

23  "medically determinable impairments considered singly and in

24  combination, do not cause more than minimal limitation in the

25  [Plaintiff's] ability to perform basic work activities."  (AR 13).

26

27      At step three, the ALJ found that Plaintiff "[did] not have

28  an impairment or combination of impairments that [met] or medically

                                 11

[equaled] one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1[.]"   (Id.).   Notwithstanding evidence of Plaintiff's physical impairments, the ALJ concluded that Plaintiff's physical impairments "[did] not approach the severity of an impairment listed in sections 1.00 or 12.04 of the Listings." (Id.).

Furthermore, the ALJ found that "[Plaintiff's] mental impairments, considered singly and in combination, [did] not meet or medically equal the criteria of listing 12.04."   (Id.).   In order to meet or medically equal the criteria of listing 12.04, "the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration." (Id.).   The ALJ stated that Plaintiff had no restrictions in activities of daily living and moderate difficulties in social functioning.   (Id.).   With regard to concentration, persistence or pace, the ALJ found that Plaintiff had mild difficulties.   (Id.). The ALJ also found that the Plaintiff "[had] experienced no episodes of decompensation, each of extended duration."   (Id.). Thus, the ALJ concluded that Plaintiff's mental impairments did not meet or medically equal the criteria of listing 12.04.   (AR 15-16).

Next, the ALJ found that "[Plaintiff had] the residual functional capacity to perform a range of sedentary work as defined

in 20 CFR 404.1567(a) and 416.967(a)." (AR 13-14).  In assessing Plaintiff's RFC, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence" and opinion evidence.  (Id.). The ALJ found that "[Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible[.]"  (AR 15).

According to the ALJ, although Plaintiff's significant work history enhanced her credibility, the medical record and testimony of the medical experts undermined her credibility because Plaintiff was found to be "capable of performing work at the sedentary level." (AR 17).  Specifically, Dr. Kephart and Dr. Kendrick each found that Plaintiff was able to "lift and carry 10 pounds occasionally and frequently."  (AR 14, 17).  In addition, Dr. Kephart and Dr. Kendrick found that Plaintiff was able to sit for six hours out of an eight-hour day, stand and walk for at least four hours out of an eight-hour day with normal breaks, "frequently, but not constantly use her right arm[] . . . [and] frequently, but not constantly interact with supervisors, co-workers and the public." (Id.).

Furthermore, regarding Plaintiff's mental health, the ALJ found that "when [Plaintiff] follows her prescribed medication, her symptoms are reduced."  (AR 17).  In addition, although Plaintiff was not receiving mental health treatment, Dr. Kapitanski

13

1  testified that Plaintiff's symptoms would significantly improve if

2  she did receive treatment.  (Id.).  Plaintiff also "admitted that

3  she did not have a psychiatric/mental disorder that would interfere

4  with work activity[]" and the record demonstrated that she did not

5  have a history of mental health treatment.  (Id.).

6

7      At step four, the ALJ determined that Plaintiff could not

8  perform her past relevant work as a security guard, bus driver,

9  bagger, home attendant, and food sales clerk.  (AR 18).  At step

10 five, the ALJ considered Plaintiff's age, education, work

11 experience, and RFC to determine whether jobs existed in

12 significant numbers in the national economy that Plaintiff was able

13 to perform.  (Id.).  Based on the Vocational Expert's testimony,

14 the ALJ found that there were jobs existing in significant numbers

15 in the national economy that Plaintiff could perform, even though

16 Plaintiff could not perform work at all exertional levels because

17 of some nonexertional limitations.  (AR 18-19).  Potential

18 available jobs included assembler, inspector, or lens inserter.

19 (AR 18-19).  The ALJ further determined that such jobs existed in

20 significant numbers in both the local and national economy.  (Id.).

21

22                                **VI.**

23                        **STANDARD OF REVIEW**

24

25     Under 42 U.S.C. § 405(g), a district court may review the

26 Commissioner's decision to deny benefits.  The court may set aside

27 the Commissioner's decision when the ALJ's findings are based on

28 legal error or are not supported by substantial evidence in the

                                 14

record as a whole. Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)); see also Simon v. Colvin, 749 F.3d 1106, 1106 (9th Cir. 2014) (citing Smolen 80 F.3d at 1279).

"Substantial evidence is more than a scintilla, but less than a preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." (Id.) (citing Jamerson, 112 F.3d at 1066; Smolen, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. Reddick, 157 F.3d at 720-21 (citing Flaten v. Sec'y, 44 F.3d 1453, 1457 (9th Cir. 1995)).

## VII.

### DISCUSSION

Plaintiff contends that the ALJ erred by improperly finding Plaintiff's testimony less than credible. (See generally Memorandum in Support of Plaintiff's Complaint ("MSPC") at 2-7).

The Court disagrees.  For the reasons discussed below, the ALJ's decision is AFFIRMED.

**A.    The ALJ Provided Clear And Convincing Reasons To Reject Plaintiff's Pain Testimony**

**1.    Legal Standard For The Assessment Of Credibility**

When assessing a claimant's credibility, the ALJ must engage in a two-step analysis.  Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012) (citing Vazquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009)).  The ALJ must determine if there is medical evidence of an impairment that could reasonably produce the symptoms alleged. (Id.).  If there is, the ALJ must make specific credibility findings to reject the testimony.  (Id.).  The ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.  Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991).

In assessing the claimant's testimony, the ALJ may consider many factors, including:

(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and

16

1      other testimony by the claimant that appears less than

2      candid;

3   (2) unexplained or inadequately explained failure to seek

4      treatment or to follow a prescribed course of

5      treatment; and

6   (3) the claimant's daily activities.

7

8  Smolen, 80 F.3d at 1284.  Additionally, the ALJ may discredit the

9  claimant's testimony where the claimant's normal activities can

10  transfer to the work setting.  Burch, 400 F.3d at 681 (noting that

11  the ALJ may discredit the claimant's allegations by making specific

12  findings related to daily activities involving skills that are

13  transferrable to the workplace); Morgan v. Comm'r of Soc. Sec.

14  Admin., 169 F.3d 595, 600 (9th Cir. 1999); see also Vertigan v.

15  Halter, 260 F.3d 1044, 1049 (9th Cir. 2001).

16

17   **2. The ALJ Provided Clear and Convincing Reasons**

18

19    The ALJ provided five specific grounds for rejecting

20  Plaintiff's pain testimony: (1) the consulting psychiatrist's

21  finding that Plaintiff was able to perform simple and repetitive

22  tasks; (2) Plaintiff's lack of psychiatric treatment; (3) the

23  psychologist medical expert's testimony of Plaintiff's

24  limitations; (4) efficacy and lack of side effects from the use of

25  medication; and (5) findings that Plaintiff was able to work at

26  the sedentary level.  (AR 17).

27

28

First, in rejecting Plaintiff's contentions regarding her mental limitations, the ALJ considered the fact that the psychiatrist, Dr. Kapitanski, found Plaintiff able to perform simple and repetitive tasks. (Id.). According to Dr. Kapitanski, Plaintiff "was able to perform simple, repetitive tasks; would have no difficulties performing work activities on a consistent basis without special or additional supervision and would have mild limitations completing a normal workday or workweek due to her mental condition." (Id.). Thus, the ALJ found that the medical evidence was inconsistent with Plaintiff's contention that she could not perform any work due to pain, to the extent the pain allegedly impacted her concentration or mental condition. (AR 15-17). See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (holding that "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects").

Second, the ALJ took note of Plaintiff's lack of psychiatric treatment history and failure to undergo mental health treatment, again to reject Plaintiff's testimony regarding her mental impairments. (AR 17, 272). An ALJ may find that a plaintiff's failure to take prescribed medications or pursue treatment that would alleviate the alleged symptoms supports a finding that plaintiff is not credible. See Orn v. Astrue, 495 F.3d 625, 636 (9th Cir. 2007)(citing Fair, 885 F.2d at 603); Bunnell, 947 F.2d at 346; 20 CFR § 404.1530(a); 416.930(a) ("In order to get benefits,

you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); 20 CFR § 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled.").

Here, Plaintiff claimed that she felt "depressed sometimes because of [her] neck, back, and leg." (AR 269). However, according to Dr. Kapitanski, despite Plaintiff's alleged mental health problem, Plaintiff did not manifest disabling symptoms and exhibited "no difficulty interacting with [people and] . . . maintaining composure and even temperament." (AR 272). Moreover, Plaintiff did not seek psychiatric treatment nor was there any evidence of prior psychiatric treatment. (AR 15). Accordingly, the ALJ properly used this finding to determine that Plaintiff's testimony was less than fully credible.

Third, the ALJ used testimony from psychologist medical expert, Dr. Glenn Griffin. (AR 16-17). Dr. Griffin testified that the Plaintiff had "moderate difficulty in social functioning[]" and "mild difficulty in concentration, persistence and pace[.]" (AR 36). In addition, Dr. Griffin observed in the medical record that Plaintiff would have mild problems with detail and complex instructions and mild limitation in interacting with the public and co-workers. (AR 37). Dr. Griffin's observations were clear and convincing reasons to reject Plaintiff's subjective testimony.

Although non-examining physicians were not given as much weight as a treating physician, an ALJ may consider the opinion of

1   non-examining physicians.  <u>See</u> <u>Lester v. Chater</u>, 81 F.3d 821, 830

2   (9th Cir. 1995)(citing <u>Winans v. Bowen</u>, 853 F.2d 643, 647 (9th Cir.

3   1987)); CFR § 404.1527(e).  If an ALJ rejected an examining

4   physician's opinion in favor of a non-examining physician's

5   opinion, the ALJ "must provide clear and convincing reasons."  <u>See</u>

6   <u>Lester</u>, 81 F.3d at 830 (citation omitted).  Here, although there

7   were minor inconsistencies between Dr. Kapitanski's and Dr.

8   Griffin's conclusions regarding Plaintiff's limitations, the ALJ

9   did not compare and reject either of the mental health

10  professional's conclusions.

11

12      Instead, the ALJ used Dr. Griffin's opinion, which favored

13  Plaintiff by finding a more severe limitation, to support the ALJ's

14  ultimate findings.  (AR 17).  For example, the ALJ noted that Dr.

15  Griffin found Plaintiff to have "moderate limitations in

16  maintaining social functioning and maintaining concentration,

17  persistence and pace[]" despite Dr. Kapitanski's finding that

18  Plaintiff "had no difficulties in maintaining social functioning[]"

19  and had "mild difficulties focusing and maintaining attention[] .

20  . . concentration, persistence, and pace."  (AR 17, 272).  Moreover,

21  the ALJ used Dr. Griffin's opinion in conjunction with Dr.

22  Kapitanski's finding, which formed a consensus that Plaintiff's

23  "symptoms [did] not preclude her from performing simple, repetitive

24  to complex work with some minor limitations."  (AR 17).  Therefore,

25  the ALJ properly considered the opinion of Dr. Griffin regarding

26  Plaintiff's mental health in determining that Plaintiff's testimony

27  was less than fully credible.

28

1     Fourth, the ALJ noted that Plaintiff would likely improve her
2  symptoms  with  treatment.   (Id.).   Specifically,  Dr.  Kapitanski
3  reported  that  Plaintiff's  mental  health  would  "significantly
4  improve"  if  Plaintiff  underwent  treatment.   (AR 272).   Again,
5  Plaintiff's  failure  to  seek  treatment  suggests  that  her  symptoms
6  were not as severe as she alleged.  (Id.).

7

8     Lastly,  in  rejecting  Plaintiff's  subjective  pain  testimony,
9  the  ALJ  noted  that  the  orthopedic  medical  expert,  Dr.  Kendrick,
10  found  Plaintiff  able  to  perform  at  the  sedentary  level.  (AR 17).
11  Specifically,  the  ALJ  used  Dr.  Kendrick's  opinion  "that  the
12  [Plaintiff's]  residual  functional  capacity  is  for  light  to
13  sedentary work [because] [s]he can frequently use her right hand[,]
14  .  .  .  lift  and  carry  20  pounds  occasionally  and  10  pounds
15  frequently[]"  and  "is limited to standing and walking for 4 hours
16  out  of  an  8  hour  day  and  sitting  for  6  hours  out  of  an  8  hour  day
17  with normal breaks."  (AR 16-17, 35).

18

19   Despite  Plaintiff's  subjective  pain  testimony  that  her
20  physical impairments undermine her ability to work, Dr. Kendrick's
21  testimony  and  review  of  the  medical  evidence  demonstrates  that
22  Plaintiff is able to work with limitations.  Thus, the ALJ properly
23  relied on Dr. Kendrick's testimony to reject Plaintiff's testimony
24  regarding her orthopedic limitations.  Moreover, the ALJ properly
25  concluded that all of the medical evidence undermines Plaintiff's
26  testimony regarding the intensity, persistence and effects of her
27  symptoms.  Accordingly, the ALJ provided clear and convincing
28   reasons  for  rejecting  Plaintiff's  pain  testimony.

1

2      **B.  <u>The ALJ's Findings Are Subject To A Harmless Error Standard</u>**

3

4          The ALJ's rejection of Plaintiff's testimony is subject to a

5      harmless error standard.  "The burden is on the party claiming

6      error to demonstrate not only the error, but also that it affected

7      his 'substantial rights,' which is to say, not merely his

8      procedural rights."  <u>Ludwig v. Astrue</u>, 681 F.3d 1047, 1054 (9th

9      Cir. 2012).  Therefore, in deciding whether to remand for error, a

10     reviewing court must consider "an estimation of the likelihood that

11     the result would have been different."  (<u>Id.</u> at 1055).

12

13

14         ALJ errors in social security cases are harmless if they are

15     "inconsequential to the ultimate nondisability determination."

16     <u>Brown-Hunter v. Colvin</u>, 806 F.3d 487, 492 (9th Cir. 2015) (quoting

17     <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d 1090, 1099 (9th

18     Cir. 2014)).  The court will set aside a denial of social security

19     benefits "only if the denial is unsupported by substantial evidence

20     in the administrative record or is based on legal error."  <u>Marsh</u>

21     <u>v. Colvin</u>, 792 F.3d 1170, 1172 (9th Cir. 2015).  Even where the

22     ALJ reaches a nondisability finding for invalid reasons, the court

23     will not reverse the ALJ's decision if the error was harmless.  <u>See</u>

24     <u>Carmickle v. Comm'r of Soc. Sec. Admin.</u>, 533 F.3d 1155, 1162 (9th

25     Cir. 2008) (reviewing adverse credibility finding for harmless

26     error, citing <u>Batson v. Comm'r of Soc. Sec. Admin.</u>, 359 F.3d 1190,

27     1197 (9th Cir. 2004)).  "[T]he relevant inquiry in this context is

28     not whether the ALJ would have made a different decision absent

1  any error, . . . it is whether the ALJ's decision remains legally

2  valid, despite such error." (Id.); see also Molina v. Astrue, 674

3  F.3d 1104, 1111 (9th Cir. 2012) (court "must uphold the ALJ's

4  findings if they are supported by inferences reasonably drawn from

5  the record").

6

7       Even though courts apply the harmless error doctrine

8  cautiously in social security cases, no "rigid rule" applies to

9  the degree of certainty required to conclude that an ALJ's error

10 was harmless. Marsh, 792 F.3d at 1173. Although remand is

11 appropriate where "the circumstances of the case show a substantial

12 likelihood of prejudice" from the error, remand is not appropriate

13 where the error's harmlessness is clear. McLeod v. Astrue, 640

14 F.3d 881, 888 (9th Cir. 2010).

15

16      Here, the ALJ's error, if any, is harmless because the error

17 is related to the overall clarity, not substance, of the ALJ's

18 opinion. The ALJ's decision may not have specifically labeled the

19 reasons he rejected Plaintiff's testimony, but it does not reflect

20 a failure to provide reasons, as Plaintiff contends. (MSPC at 2-

21 7). The clarity issue in this case is "inconsequential to the

22 ultimate nondisability determination" because the grounds for the

23 ALJ's decision are present in the opinion, regardless of any

24 alleged difficulty in identifying those grounds. Brown-Hunter,

25 806 F.3d at 492. (AR 17). Furthermore, the ALJ grounded his

26 decision with substantial evidence from the medical record and

27 medical expert testimony. (AR 17). As evident from the discussion

28 of the ALJ's decision above, the reasons provided are supported by

1   substantial evidence in the record and are legitimate grounds to
2   reject Plaintiff's testimony.

3

4       In sum, the ALJ offered clear and convincing reasons supported
5   by substantial evidence for finding Plaintiff's subjective
6   testimony less than fully credible.  Moreover, any error in the
7   description of those reasons, if any, is harmless.

8

9

10                              **VIII.**
11                           **CONCLUSION**

12

13      Consistent with the foregoing, IT IS ORDERED that Judgment be
14  entered AFFIRMING the decision of the Commissioner. The Clerk of
15  the Court shall serve copies of this Order and the Judgment on
16  counsel for both parties.

17

18  DATED:  July 7, 2016            _____/S/_____
19                                  SUZANNE H. SEGAL
                                    UNITED STATES MAGISTRATE JUDGE
20

21  **THIS DECISION IS NOT INTENDED FOR PUBLICATION IN LEXIS, WESTLAW OR**
22  **OTHER LEGAL DATABASE.**

23

24

25

26

27

28

                                  24